**L. BATLIN & SON, INC., Appellee,**

v.

**Jeffrey SNYDER d/b/a J. S. N. Y. and Etna Products Co., Inc., Appellants.**

**No. 1249, Docket 75–7308.**

United States Court of Appeals, Second Circuit.

Submitted Jan. 19, 1976.

Decided April 12, 1976.

Robert C. Faber, Stanley H. Lieberstein, Ostrolenk, Faber, Gerb & Soffen, New York City, for appellants.

Mark H. Sparrow, New York City (Jacobs & Jacobs, P. C., Albert L. Jacobs, Jr., New York City, of counsel), for appellee.

James E. Siegel, Myron Greenspan, Lackenbach, Lilling & Siegel, New York City, for E. Mishan & Sons, Inc., amicus curiae.

Before KAUFMAN, Chief Judge, and FEINBERG, MANSFIELD, MULLIGAN, OAKES, TIMBERS, GURFEIN, VAN GRAAFEILAND, and MESKILL, Circuit Judges.

OAKES, Circuit Judge:

Appellants Jeffrey Snyder and Etna Products Co., Inc., his licensee, appeal from a preliminary injunction granted L. Batlin & Son, Inc. (Batlin), compelling appellants to cancel a recordation of a copyright with the United States Customs Service and restraining them from enforcing that copyright. The district court held, 394 F.Supp. 1389 (S.D.N.Y.1975), as it had previously in *Etna Products Co. v. E. Mishan & Sons*, 75 Civ. 428 (S.D.N.Y. Feb. 13, 1975), that there was "little probability" that appellants' copyright "will be found valid in the trial on the merits" on the basis that any variations between appellants' copyrighted plastic bank and a cast iron bank in the public domain were merely "trivial," and hence appellants' bank insufficiently "original" to support a copyright. 394 F.Supp. at 1390,

*citing Alfred Bell & Co. v. Catalda Fine Arts, Inc.,* 191 F.2d 99 (2d Cir. 1951). We agree with the district court and therefore affirm the judgment granting the preliminary injunction.

Uncle Sam mechanical banks have been on the American scene at least since June 8, 1886, when Design Patent No. 16,728, issued on a toy savings bank of its type. The basic delightful design has long since been in the public domain. The banks are well documented in collectors' books and known to the average person interested in Americana. A description of the bank is that Uncle Sam, dressed in his usual stove pipe hat, blue full dress coat, starred vest and red and white striped trousers, and leaning on his umbrella, stands on a four- or five-inch wide base, on which sits his carpetbag. A coin may be placed in Uncle Sam's extended hand. When a lever is pressed, the arm lowers, and the coin falls into the bag, while Uncle Sam's whiskers move up and down. The base has an embossed American eagle on it with the words "Uncle Sam" on streamers above it, as well as the word "Bank" on each side. Such a bank is listed in a number of collectors' books, the most recent of which may be F. H. Griffith, Mechanical Banks (1972 ed.) where it was listed as No. 280, and is said to be not particularly rare.

Appellant Jeffrey Snyder doing business as "J.S.N.Y." obtained a registration of copyright on a plastic "Uncle Sam bank" in Class G ("Works of Art") as "sculpture" on January 23, 1975. According to Snyder's affidavit, in January, 1974, he had seen a cast metal antique Uncle Sam bank with an overall height of the figure and base of 11 inches.[1] In April, 1974, he flew to Hong Kong to arrange for the design and eventual manufacture of replicas of the bank as Bicentennial items, taking the cast metal Uncle Sam bank with him. His Hong Kong buying agent selected a firm, "Unitoy," to make the plastic "prototype" because of its price and the quality of its work. Snyder wanted his bank to be made of plastic and to be shorter than the cast metal sample "in order to fit into the required price range and quality and quantity of material to be used." The figure of Uncle Sam was thus shortened from 11 to nine inches, and the base shortened and narrowed. It was also decided, Snyder averred, to change the shape of the carpetbag and to include the umbrella in a one-piece mold for the Uncle Sam figure, "so as not to have a problem with a loose umbrella or a separate molding process." The Unitoy representative made his sketches while looking at the cast metal bank. After a "clay model" was made, a plastic "prototype" was approved by Snyder and his order placed in May, 1974. The plastic bank carried the legend "© Copyright J.S.N.Y." and was assertedly first "published" on October 15, 1974, before being filed with the Register of Copyrights in January, 1975.

Appellee Batlin is also in the novelty business and as early as August 9, 1974, ordered 30 cartons of cast iron Uncle Sam mechanical banks from Taiwan where its president had seen the bank made. When he became aware of the existence of a plastic bank, which he considered "an almost identical copy" of the cast iron bank, Batlin's trading company in Hong Kong procured a manufacturer and the president of Batlin ordered plastic copies also. Beginning in April, 1975, Batlin was notified by the United States Customs Service that the plastic banks it was receiving were covered by appellants' copyright. In addition the Customs Service was also refusing entry to cast iron banks previously ordered, according to the Batlin affidavit. Thus Batlin instituted suit for a judgment declaring appellants' copyright void and for damages for unfair competition and restraint of trade. The sole question on this appeal is whether Judge Metzner abused his discretion in granting Batlin a preliminary injunction. We find that he did not.

---

1. No cast iron *antique* bank was introduced in evidence below. A cast metal *replica* bank was, and the court below, the parties, the witnesses, and this court have treated the case as if the appellants' plastic bank were to be compared to the cast metal replica.

This court has examined both the appellants' plastic Uncle Sam bank made under Snyder's copyright and the uncopyrighted model cast iron mechanical bank which is itself a reproduction of the original public domain Uncle Sam bank. Appellant Snyder claims differences not only of size but also in a number of other very minute details: the carpetbag shape of the plastic bank is smooth, the iron bank rough; the metal bank bag is fatter at its base; the eagle on the front of the platform in the metal bank is holding arrows in his talons while in the plastic bank he clutches leaves, this change concededly having been made, however, because "the arrows did not reproduce well in plastic on a smaller size." The shape of Uncle Sam's face is supposedly different, as is the shape and texture of the hats, according to the Snyder affidavit. In the metal version the umbrella is hanging loose while in the plastic item it is included in the single mold. The texture of the clothing, the hairline, shape of the bow ties and of the shirt collar and left arm as well as the flag carrying the name on the base of the statue are all claimed to be different, along with the shape and texture of the eagles on the side. Many of these differences are not perceptible to the casual observer. Appellants make no claim for any difference based on the plastic mold lines in the Uncle Sam figure which are perceptible.

Our examination of the banks results in the same conclusion as that of Judge Metzner in *Etna Products*, the earlier case enjoining Snyder's copyright, that the Snyder bank is "extremely similar to the cast iron bank, save in size and material" with the only other differences, such as the shape of the satchel and the leaves in the eagle's talons being "by all appearances, minor." Similarities include, more importantly, the appearance and number of stripes on the trousers, buttons on the coat, and stars on the vest and hat, the attire and pose of Uncle Sam, the decor on his base and bag, the overall color scheme, the method of carpetbag opening, to name but a few. After seeing the banks and hearing conflicting testimony from opposing expert witnesses as to the substantiality or triviali-

ty of the variations and as to the skill necessary to make the plastic model, the court below stated:

I am making a finding of fact that as far as I'm concerned, it is practically an exact copy and whatever you point to in this [sic] differences are so infinitesimal they make no difference. All you have proved here by the testimony today is that if you give a man a seven-inch model and you say I want this to come out in a five-inch model, and he copies it, the fact that he has to have some artistic ability to make a model by reducing the seven to the five adds something to it. That is the only issue in this case.

Mr. Faber: No, sir.

The Court: That is the only issue. I have given you my finding of fact.

As Judge Metzner went on to say in his opinion, the appellants' plastic version "reproduces" the cast iron bank "except that it proportionately reduces the height from approximately eleven inches to approximately nine inches with trivial variations." 394 F.Supp. at 1390. The court noted that appellants "went to great pains on the hearing to prove that there were substantial differences between the iron and the plastic articles," *id.* at 1391, and found that there had been no "level of input" such as in *Alva Studios, Inc. v. Winninger*, 177 F.Supp. 265, 267 (S.D.N.Y.1959) ("great skill and originality" called for in producing an exact scale reduction of Rodin's famous "Hand of God," to museum specifications). The substance of appellee's expert's testimony on which the district judge evidently relied was that the variations found in appellants' plastic bank were merely "trivial" and that it was a reproduction of the metal bank made as simply as possible for the purposes of manufacture. In other words, there were no elements of difference that amounted to significant alteration or that had any purpose other than the functional one of making a more suitable (and probably less expensive) figure in the plastic medium.

What the leading authority has called "the one pervading element prerequi-

site to copyright protection regardless of the form of the work" is the requirement of originality—that the work be the original product of the claimant. 1 M. Nimmer, The Law of Copyright § 10, at 32 (1975). This derives from the fact that, constitutionally, copyright protection may be claimed only by "authors." U.S.Const., art. I, § 8; *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58, 4 S.Ct. 279, 281, 28 L.Ed. 349, 351 (1884). Thus, "[o]ne who has slavishly or mechanically copied from others may not claim to be an author." 1 M. Nimmer, *supra*, § 6, at 10.2. Since the constitutional requirement must be read into the Copyright Act, 17 U.S.C. § 1 *et seq.*, the requirement of originality is also a statutory one. *Chamberlin v. Uris Sales Corp.*, 150 F.2d 512 (2d Cir. 1945). It has been the law of this circuit for at least 30 years that in order to obtain a copyright upon a reproduction of a work of art under 17 U.S.C. § 5(h)[2] that the work "contain some substantial, not merely trivial originality . . . ." *Chamberlin v. Uris Sales Corp., supra*, 150 F.2d at 513.

Originality is, however, distinguished from novelty; there must be independent creation, but it need not be invention in the sense of striking uniqueness, ingeniousness, or novelty, since the Constitution differentiates "authors" and their "writings" from "inventors" and their "discoveries." *Alfred Bell & Co. v. Catalda Fine Arts, Inc., supra*, 191 F.2d at 100; *Runge v. Lee*, 441 F.2d 579, 581 (9th Cir.), *cert. denied*, 404 U.S. 887, 92 S.Ct. 197, 30 L.Ed.2d 169 (1971). Originality means that the work owes its creation to the author and this in turn means that the work must not consist of actual copying. *Alfred Bell & Co. v. Catalda Fine Arts, Inc., supra*, 191 F.2d at 102–03; *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 54 (2d Cir. 1936),

*aff'd*, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940).[3]

The test of originality is concededly one with a low threshold in that "[a]ll that is needed . . . is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.'" *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d at 103. But as this court said many years ago, "[w]hile a copy of something in the public domain will not, if it be merely a copy, support a copyright, a distinguishable variation will. . . . ." *Gerlach-Barklow Co. v. Morris & Bendien, Inc.*, 23 F.2d 159, 161 (2d Cir. 1927).

Necessarily, none of these underlying principles is different in the case of "[r]eproductions of a work of art," 17 U.S.C. § 5(h), from the case of "[w]orks of art . . . ," 17 U.S.C. § 5(g). The requirement of substantial as opposed to trivial variation and the prohibition of mechanical copying, both of which are inherent in and subsumed by the concept of originality, apply to both statutory categories. There is implicit in that concept a "minimal element of creativity over and above the requirement of independent effort." 1 M. Nimmer, *supra*, § 10.2, at 36. While the quantum of originality that is required may be modest indeed, *Herbert Rosenthal Jewelry Corp. v. Grossbardt*, 436 F.2d 315, 316 (2d Cir. 1970), we are not inclined to abandon that requirement, even if in the light of the constitutional and statutory bases therefor and our precedents we could do so.

A reproduction of a work of art obviously presupposes an underlying work of art. Since *Mazer v. Stein*, 347 U.S. 201, 218, 74 S.Ct. 460, 470, 98 L.Ed. 630, 642 (1954) (statuette of Balinese dancer copy-

---

**2.** While appellant Snyder's copyright was obtained for a "Work of Art," it may be treated as one obtained for "reproductions of a work of art," *Soptra Fabrics Corp. v. Stafford Knitting Mills, Inc.*, 490 F.2d 1092, 1094 (2d Cir. 1974), since errors in classification do not invalidate or impair copyright protection under this express language of 17 U.S.C. § 5.

**3.** The only case that appears to be an exception to this rule is the "Hand of God" case. *Alva Studios, Inc. v. Winninger*, 177 F.Supp. 265 (S.D.N.Y.1959) (exact scale artistic reproduction of highly complicated statue made with great precision was "original" as requiring "great skill and originality"). This case is discussed in the text *infra*.

rightable despite intended use as lamp base), it has been established that mass-produced commercial objects with a minimal element of artistic craftsmanship may satisfy the statutory requirement of such a work. *See also Puddu v. Buonamici Statuary, Inc.*, 450 F.2d 401, 402 (2d Cir. 1971). So, too, a toy which qualifies as a work of art such as the original Uncle Sam mechanical bank may qualify as a "work of art" under Section 5(g). *See Rushton v. Vitale*, 218 F.2d 434, 435–36 (2d Cir. 1955); *Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623, 624 (2d Cir. 1962). The underlying work of art may as here be in the public domain. But even to claim the more limited protection given to a reproduction of a work of art (that to the distinctive features contributed by the reproducer), the reproduction must contain "an original contribution not present in the underlying work of art" and be "more than a mere copy." 1 M. Nimmer, *supra*, § 20.2, at 93.

■ According to Professor Nimmer, moreover, "the mere reproduction of a work of art in a different medium should not constitute the required originality for the reason that no one can claim to have independently evolved any particular medium." *Id.* at 94. *See Millworth Converting Corp. v. Slifka*, 276 F.2d 443, 444–45 (2d Cir. 1960). *Cf. Gardenia Flowers, Inc. v. Joseph Markovitz, Inc.*, 280 F.Supp. 776, 781 (S.D. N.Y.1968). Professor Nimmer refers to *Doran v. Sunset House Distributing Corp.*, 197 F.Supp. 940 (S.D.Cal.1961), *aff'd*, 304 F.2d 251 (9th Cir. 1962), as suggesting "the ludicrous result that the first person to execute a public domain work of art in a different medium thereafter obtains a monopoly on such work in such medium, at least as to those persons aware of the first such effort." 1 M. Nimmer, *supra*, § 20.2, at 94. We do not follow the *Doran* case. We do follow the school of cases in this circuit and elsewhere supporting the proposition that to support a copyright there must be at least some substantial variation, not merely a trivial variation such as might occur in the translation to a different medium.

■ Nor can the requirement of originality be satisfied simply by the demonstration of "physical skill" or "special training" which, to be sure, Judge Metzner found was required for the production of the plastic molds that furnished the basis for appellants' plastic bank. A considerably *higher* degree of skill is required, true artistic skill, to make the reproduction copyrightable. Thus in *Alfred Bell & Co. v. Catalda Fine Arts, Inc., supra*, 191 F.2d at 104–05 n.22, Judge Frank pointed out that the mezzotint engraver's art there concerned required "great labour and talent" to effectuate the "management of light and shade . . . produced by different lines and dots . .," means "very different from those employed by the painter or draughtsman from whom he copies. . . ." *See also Millworth Converting Corp. v. Slifka, supra* (fabric designer required one month of work to give three-dimensional color effect to flat surface). Here on the basis of appellants' own expert's testimony it took the Unitoy representative "[a]bout a day and a half, two days work" to produce the plastic mold sculpture from the metal Uncle Sam bank. If there be a point in the copyright law pertaining to reproductions at which sheer artistic skill and effort can act as a substitute for the requirement of substantial variation, it was not reached here.

Appellants rely heavily upon *Alva Studios, Inc. v. Winninger, supra*, the "Hand of God" case, where the court held that "great skill and originality [were required] to produce a scale reduction of a great work with exactitude." 177 F.Supp. at 267. There, the original sculpture was, "one of the most intricate pieces of sculpture ever created" with "[i]nnumerable planes, lines and geometric patterns . . . interdependent in [a] multi-dimensional work." *Id.* Originality was found by the district court to consist primarily in the fact that "[i]t takes 'an extremely skilled sculptor' many hours working directly in front of the original" to effectuate a scale reduction. *Id.* at 266. The court, indeed, found the exact replica to be so original, distinct, and creative as to constitute a work of art in itself. The complexity and exactitude there involved

distinguishes that case amply from the one at bar. As appellants themselves have pointed out, there are a number of trivial differences or deviations from the original public domain cast iron bank in their plastic reproduction. Thus concededly the plastic version is not, and was scarcely meticulously produced to be, an exactly faithful reproduction. Nor is the creativity in the underlying work of art of the same order of magnitude as in the case of the "Hand of God." Rodin's sculpture is, furthermore, so unique and rare, and adequate public access to it such a problem that a significant public benefit accrues from its precise, artistic reproduction. No such benefit can be imagined to accrue here from the "knock-off" reproduction of the cast iron Uncle Sam bank. Thus appellants' plastic bank is neither in the category of exactitude required by *Alva Studios* nor in a category of substantial originality; it falls within what has been suggested by the amicus curiae is a copyright no-man's land.

Absent a genuine difference between the underlying work of art and the copy of it for which protection is sought, the public interest in promoting progress in the arts—indeed, the constitutional demand, *Chamberlin v. Uris Sales Corp., supra*—could hardly be served. To extend copyrightability to minuscule variations would simply put a weapon for harassment in the hands of mischievous copiers intent on appropriating and monopolizing public domain work. Even in *Mazer v. Stein, supra,* which held that the statutory terms "works of art" and "reproduction of works of art" (terms which are clearly broader than the earlier term "works of the fine arts") permit copyright of quite ordinary mass-produced items, the Court expressly held that the objects to be copyrightable, "must be original, that is, the author's tangible expression of his ideas." 347 U.S. at 214, 74 S.Ct. at 468, 98 L.Ed. at 640. No such originality, no such expression, no such ideas here appear.

To be sure, the test of "originality" may leave a lot to be desired, although it is the only one we have, in that as one scholar has said, the originality requirement does not perform the function of excluding commonplace matters in the public domain from copyright status very effectively. *See* Comment, *Copyright Protection for Mass Produced Commercial Products: A Review of the Developments Following Mazer v. Stein,* 38 U.Chi.L.Rev. 807 (1971). In any event, however, the articles should be judged on their own merits, *id.* at 823, and on these merits appellants' claim must fail. Here as elsewhere in the copyright law there are lines that must be drawn even though reasonable men may differ where.

Judgment affirmed.

MESKILL, Circuit Judge (dissenting) (with whom TIMBERS and VAN GRAAFEILAND, Circuit Judges, concur):

I respectfully dissent.

In the instant case the author has contributed substantially more than a merely trivial variation. "Any 'distinguishable variation' of a prior work will constitute sufficient originality to support a copyright if such variation is the product of the author's independent efforts, and is more than merely trivial." 1 Nimmer on Copyright § 10.1 at 34.2. In accord with the purposes of the copyright law to promote progress by encouraging individual effort through copyright protection, we should require only minimal variations to find copyrightability. The independent sculpting of the mold for the plastic bank and the aggregated differences in size and conformation of the figurine should satisfy this standard.

The plastic bank in question admittedly is based on a work now in the public domain. This does not render it uncopyrightable since "[i]t is hornbook that a new and original plan or combination of existing materials in the public domain is sufficiently original to come within the copyright protection . . . ." *Alva Studios, Inc. v. Winninger,* 177 F.Supp. 265, 267 (S.D.N.Y.1959). The courts have repeatedly emphasized that only a modest level of originality is neces-

sary to be eligible for a copyright. *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 102–103 (2 Cir. 1951). *See also, Thomas Wilson & Co. v. Irving J. Dorfman Co.*, 433 F.2d 409, 411 (2 Cir. 1970) and *Dan Kasoff, Inc. v. Novelty Jewelry Co., Inc.*, 309 F.2d 745, 746 (2 Cir. 1962), where this Court required only a "faint trace of originality" to support a copyright.

Looking first to copyright cases involving sculptures, in *Puddu v. Buonamici Statuary, Inc.*, 450 F.2d 401, 402 (2 Cir. 1971), this Court found that where plaintiff's employee had sculpted statuettes from scratch, even though there was a "strong family resemblance between the copyrighted and the uncopyrighted models, the differences suffice to satisfy the modest requirement of originality. . . . Originality sufficient for copyright protection exists if the 'author' has introduced any element of novelty as contrasted with the material previously known to him." Similarly, in *Blazon, Inc. v. DeLuxe Game Corp.*, 268 F.Supp. 416, 422 (S.D.N.Y.1965) the court assumed a hobby horse could be copyrightable since plaintiff could have added "unique features to the horse, enlarged it and made it sufficiently dissimilar from defendant's horse as to render it copyrightable . . . ." See also *Royalty Designs, Inc. v. Thrifticheck Service Corp.*, 204 F.Supp. 702 (S.D.N.Y.1962) (banks in shape of dogs); *F. W. Woolworth Co. v. Contemporary Arts*, 193 F.2d 162 (1 Cir. 1951) (originality in shape of dog figurine). The fabric cases likewise have found designs copyrightable with only a "very modest grade of originality." *Peter Pan Fabrics, Inc. v. Dan River Mills, Inc.*, 295 F.Supp. 1366, 1368 (S.D.N.Y.1969). In the latter case, the embellishment and expansion of purchased designs before being rolled onto fabric constituted the "slight addition" sufficient to qualify as originality. Finally, there are also cases where *no* changes were required because the process of reproduction itself required great skill. See *Alva Studios, Inc. v. Winninger, supra*, where originality was found in a detailed scaled reproduction differing only in the treatment of the rear side of the base; see

also *Millworth Converting Corp. v. Slifka*, 276 F.2d 443 (2 Cir. 1960) (creation of a three dimensional effect on a flat fabric required effort and skill).

Turning to the case at bar, Judge Metzner made a factual finding that the plastic bank embodied only trivial variations from the bank in the public domain. There is precedent in this Circuit to support appellate reconsideration of factual findings where the panel has the same record and no part of the decision below turned on credibility. *Soptra Fabrics Corp. v. Stafford Knitting Mills, Inc.*, 490 F.2d 1092, 1093 (2 Cir. 1974) (per curiam). This principle should be applied to the present situation since this Court has had the opportunity to view the exhibits. I make no claim that the process of sculpting involved here is as complex as in *Alva Studios* (scaled version of Rodin sculpture) or in *Alfred Bell* (mezzotint engravings of art classics). However, those cases depended solely on difficulty of process to establish originality, since there was no attempt to alter or improve upon the underlying work.

The most obvious differences between the two exhibits in this case are size and medium. While these factors alone may not be sufficient to render a work copyrightable, they surely may be considered along with the other variations. On the other hand, the author's reasons for making changes should be irrelevant to a determination of whether the differences are trivial. As noted in *Alfred Bell, supra*, 191 F.2d at 105, even an inadvertent variation can form the basis of a valid copyright. After the fact speculation as to whether Snyder made changes for aesthetic or functional reasons should not be the basis of decision.

The primary variations between the two banks involve height; medium; anatomical proportions of the Uncle Sam figure, including shape and expression of face; design of the clothing (hat, tie, shirt, collar, trousers); detail around the eagle figure on the platform; placement of the umbrella; and the shape and texture of the satchel. Granting Snyder a copyright protecting

these variations would ensure only that no one could copy his particular version of the bank now in the public domain, i. e., protection from someone using Snyder's figurine to slavishly copy and make a mold. In *Alva Studios, supra,* 177 F.Supp. at 267, where the author produced no distinctive variations of his own in reproducing the Rodin sculpture, the court still found that the reproduction was copyrightable and that infringement was possible; although mere resemblance would not justify a finding of infringement where the principal elements of a design were taken from the public domain, evidence of actual copying would support such a finding.

This approach seems quite in accord with the purpose of the copyright statute—to promote progress by encouraging individual effort through copyright protection. The relatively low standard of originality required for copyrightability is derived from this purpose. The objective is to progress first and, if necessary, litigate the question of infringement later. In the meantime, the public culture benefits from progress; the issue of who is entitled to the profits should not induce rigidity and slowness in industries and fields naturally subject to great flux.

Accordingly, I would reverse the district court decision.